**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

|  |  |
|---|---|
| CARMEN JOHNSON, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| NATIONAL CAPITOL CONTRACTING, LLC, | ) |
| 7921 Jones Branch Dr., Ste. 300, | ) **Civil Case No.** _____ |
| McLean, VA 22102, | ) |
| | ) |
| Serve Registered Agent: | ) |
| | ) |
| Christopher Richard Marquez, | ) |
| 7921 Jones Branch Dr., Ste. 300 | ) |
| McLean, VA 22102, | ) |
| | ) |
| *and* | ) |
| | ) |
| EARL SMITH, | ) |
| 10832 Split Rail Dr. | ) |
| Manassas, VA 20112, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

**CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff Carmen Johnson brings this civil complaint against Defendants National Capitol

Contracting, LLC (NCC) and Earl Smith for violations of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101 *et seq.*, the Montgomery County, Maryland Human Relations Ordinance § 27-29

(MCHRO), codified at Md. Ann. Code, State Gov't, § 20-1202 *et seq.*, and wrongful termination

in violation of public policy.

1

## PARTIES

1.      Plaintiff is a resident of Fort Washington, Maryland, and is a former employee of NCC and Smith.

2.      Defendant NCC is a Virginia limited liability company and has its principal office address at 7921 Jones Branch Drive, Suite 300, McLean, Virginia 22102.

3.      Defendant Smith is a resident of Manassas in Prince William County, Virginia, and is NCC's chief operating officer.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and 31 U.S.C. § 3732(a)-(b). This is an action arising under the laws of the United States, specifically Title VII, the ADA, and Section 1981.

5.      This Court has supplemental jurisdiction over the claims brought under the MCHRO and Maryland common law for wrongful termination in violation of public policy

6.      This Court has personal jurisdiction over NCC because NCC conducts regular business in this district and maintains regular and systematic contacts within this district.

7.      This Court has personal jurisdiction over Earl Smith because Smith conducts regular business in this district and maintains regular and systematic contacts within this district as NCC's chief operating officer.

8.      This Court has jurisdiction over the claims in this complaint brought under the law of the State of Maryland pursuant to the MCHRO, and Maryland common law because NCC conducts regular business in Montgomery County and maintains regular and systemic contacts in this district.

9.      Venue in this judicial district and division is proper pursuant to 28 U.S.C. §

1391(b)(2) because NCC and Smith conduct regular business in this district.

10.     Venue in this judicial district and division is also proper pursuant to 28 U.S.C. § 1391(b)(1) because NCC and Smith conduct regular business and have extensive and deliberate contacts in this judicial district

## ADMINISTRATIVE EXHAUSTION

11.     On December 20, 2024, Johnson timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), cross-filing with the Montgomery County Office of Human Rights (MCOHR). The EEOC referred the case to the MCOHR for investigation. More than 180 have passed since the filing of the charge of discrimination and no right to file letter has been issued.

## FACTUAL ALLEGATIONS

12.     Johnson is an African American woman.

13.     NCC hired Johnson as a systems analyst in or about February 2014.

14.     NCC promoted Johnson to program manager after only three months of employment because of her strong performance.

15.     Johnson was instrumental in NCC's successful bid for a multimedia contract with the National Institute of Health (NIH).

16.     Johnson managed NCC's administration of its contract with the NIH.

17.     Johnson often worked on-site at the NIH's headquarters in Bethesda, Maryland where NCC was given leave to set up its offices.

18.     The NIH closed its Bethesda, Maryland campus in or about early 2020 because of the COVID-19 pandemic.

19.     The NIH did not conduct a complete closure of its premises, resulting in food and

other items remaining behind and accessible to vermin during its Covid-19 shut down. Food remained accessible at NIH's campus, attracting mice, rats, and other vermin to the premises.

20.     NCC promoted Johnson to director of operations on its multimedia contract with the NIH in or about March of 2023.

21.     Johnson met James "Jim" Campbell, a NCC senior AV lead engineer (Caucasian, male), hired by NCC to work on its contract with NIH in or about August 2023. Campbell smelled of alcohol during the meeting, and NCC project manager Kim Brown advised Johnson that Campbell would be a "problem."

22.     Johnson asked Brown to inform Smith, who was NCC's chief operating officer. Smith is a Caucasian male, and Brown advised Smith about Campbell's smelling of alcohol, but Smith did not take any action.

23.     In or about August 2023, Johnson advised NCC's owner, Chris Marquez, that other employees noticed Campbell smelling of alcohol every day and that Smith was not taking action. Marquez responded by declaring that Campbell's behavior was unacceptable and that Smith was "really f-ing up on this."

24.     In or about September of 2023, another employee approached Johnson about Campbell smelling of alcohol in the workplace, and Johnson reported the foregoing to Smith. Johnson also advised Smith that Campbell had yelled at and been belligerent toward staff, but Smith did not take any action against Campbell.

25.     Johnson was present when Mike Burnham, a NIH contracting officer's representative, called Campbell a "fucking idiot." Burnham also asked Johnson questions to the effect of "where do you get these people from? Do you want to lose the contract?"

26.     In or about October of 2023, the NIH reopened its Bethesda, Maryland campus

4

for in-person work. Shortly thereafter, Brown advised Johnson that there were "mice everywhere" in the office, and so Johnson contacted Smith and advised him of Brown's report of mice in the workplace.

27.     Johnson began reporting for work at branch chief Ken Ryland's floor on the NIH campus shortly after her conversation with Smith, and Johnson discovered that every office on the floor had at least one mousetrap in it.

28.     Johnson attended an "open forum" walkthrough of the office on or about October 3, 2023, her second day in the office. Johnson disclosed to all in attendance during this walkthrough, including contracting officer's representative Rodney Hall, Ryland, Smith, and Campbell, that something needed to be done about the mice in the workplace. In response, Ryland requested that Johnson submit a ticket to building pest control when she saw mice.

29.     Johnson discovered vermin feces on her desk shortly after her October 3, 2024 complaint about mice in the workplace, and Johnson also frequently heard mice running in the ceiling above her office and whistling in the pipes. Johnson reported the mice in the ceiling and pipes to Smith, but Smith dismissed her concerns, and NCC took no action to remedy the situation.

30.     In or about the end of October 2023, Johnson heard employees and clients screaming in the hallway. An employee approached Johnson and informed her that there were rats in the workplace. Johnson saw the rats and called Smith and Ryland, respectively, to report the vermin. Johnson also called pest control to assist with the rats.

31.     Johnson teleworked in February of 2024 due to various health issues she experienced during that time period, and she returned to in-person work in or about March of 2024 and sought care from her primary physician after she began coming home from work with

hives all over her body.

32.     Johnson commissioned tests from her primary care physician, an allergist, and a dermatologist. The doctors independently diagnosed Johnson with chronic urticaria, a condition which can cause hives, angioedema, or both to appear and that can be triggered by animal contact or exposure to animals.

33.     Smith informed Johnson that NCC was terminating her telework after she returned to work in or about March of 2024, and Johnson requested to work remotely because of the vermin in the workplace.

34.     NCC project manager Stephen Eagles informed Johnson that the NIH no longer supported remote work on NCC's contract. Eagles also claimed that the contract's scope changed, but he refused to provide Johnson with any documentation to that effect.

35.     Johnson submitted to NCC a package compiling her doctors' notes and requesting a reasonable accommodation on or about April 17, 2024. NCC's human resources department and Smith received Johnson's reasonable accommodations package.

36.     NCC did not grant Johnson's reasonable accommodation for her chronic urticaria, and so Johnson contacted Joel Gascot, a secondary contracting officer's representative at NIH, and informed him of the problems she was experiencing in the work environment.

37.     Gascot offered Johnson an unsecured cubby space to work in positioned outside of the conference room area, and Johnson accepted the unsecured cubby space the NIH offered to her.

38.     Johnson had to pack her work materials and take them with her whenever she left the cubby space because it was an insecure location, creating an inefficiency that other employees did not have.

39.     Johnson submitted a complaint to the Occupational Safety and Health Administration (OSHA) on or about April 26, 2024, alleging that NCC's offices at the NIH had hazards including "rats, mice, and other vermin." She also complained that the building had "visible black mold on the ceiling [tiles], water bubbles, and [gaping] holes," a "water line demarcation," and a persistent smell.

40.     Johnson also reported to OSHA in her April 26, 2024 complaint that she and a colleague had been experiencing "persistent respiratory issues," and she provided pictures of the holes and mold in the workplace ceiling as corroboration of her complaint.

41.     Angela Dance, an OSHA case manager, contacted Smith regarding Johnson's OSHA complaint on or about May 1, 2024, and the NIH commissioned an industrial hygienist to report on the indoor air quality and mold status in response to Johnson's OSHA complaint.

42.     On or about May 7, 2024, the industrial hygienist reported to the NIH that the investigation revealed mold in several locations and recommended that stained and wet ceiling tiles should be replaced and that remediation of mold should be conducted.

43.     NIH's pest control contractor, American Pest, "performed a thorough integrated pest management inspection to the interior and exterior of the facility and found no evidence of rat/mouse activity at building 45 Room 2Bc.02; Conference Room A, B, C1, C2, E1, E2, F1, F2, G1, or G2." NIH's report stated that "there have not been any reported sightings by facility staff or visual evidence of rodents in this building" for the last six months.

44.     On or about May 9, 2024, the Department of Labor responded to Johnson's OSHA complaint, stating that NCC "advised . . . that the hazards [she] complained about have been investigated" and that it concluded there were no mouse sightings or signs of mouse feces in the workplace. Thereafter, OSHA closed Johnson's complaint.

45.    Johnson made her OSHA complaint anonymously, but she was one of only two NCC employees working at NIH under Smith and was the only person who regularly complained about the office conditions.

46.    On or about May 20, 2024, Johnson reported to NCC's finance office that NCC paid her for only 72 hours in the preceding pay period despite her having worked 87 hours and having taken one sick day. Smith had required her to take a leave without pay, decreasing her pay even though she had worked over the required amount of hours for the pay period.

47.    Smith hired three new employees without Johnson's knowledge on or about May 20, 2024. These employees were all hired to take on facets of Johnson's duties.

48.    Smith and an NCC human resources representative terminated Johnson's employment the afternoon of May 20, 2024, via Zoom call. They informed Johnson that the government decided to terminate her from the contract and claimed that Johnson's position was to be removed and replaced by the three new hires. NCC also immediately revoked Johnson's employment benefits, including her health insurance, upon terminating her employment.

49.    Johnson applied for unemployment benefits upon her termination, and when her application was accepted, NCC contested, falsely stating that Johnson quit her job.

50.    Smith terminated seven African American employees, including Johnson, and none were performing poorly. However, Smith has never fired a Caucasian employee, even those who were performing poorly. For example, NCC continues to employ Campbell on the NIH contract despite his inadequacies as an employee and Smith's knowledge of his inadequacies.

51.    As a result of Defendants' illegal actions, Johnson has sustained economic damages and mental anguish, and she will continue to sustain damages into the future.

## COUNT I
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. 2000e *et seq*
### Gender, Color, and/or Race Discrimination
### (Against Defendant NCC)

52. Johnson incorporates the allegations in the foregoing paragraphs as though alleged herein.

53. Title VII makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

54. Johnson is an "employee" as defined in 42 U.S.C. § 20000e(f).

55. NCC is an "employer" as defined by 42 U.S.C. § 20000e.

56. Johnson is a member of a protected class under Title VII as she is African American.

57. Johnson is a member of a protected class under Title VII as she is female.

58. Defendant NCC unlawfully discriminated against Plaintiff on the basis of her gender, color, and/or race when she was terminated on May 20, 2024, among seven other female African Americans.

59. Johnson's gender, color, and/or race were the determining factor and/or a motivating factor in the NCC's adverse actions against her.

60. As a result of Defendant NCC's violations of Title VII, Plaintiff has suffered and

is continuing to suffer injuries, including, but not limited to, damage to her career and damage to her professional and personal reputation.

**COUNT II**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. 2000e** *et seq*
**Retaliation**
**(Against Defendant NCC)**

61. Johnson incorporates the allegations in the foregoing paragraphs as though alleged herein.

62. NCC is an "employer" as defined by 42 U.S.C. § 20000e.

63. Defendant Smith and NCC violated Title VII, by retaliating against Johnson when

64. Johnson is an "employee" as defined in 42 U.S.C. § 20000e(f).

65. Title VII makes it unlawful for an employee to be subjected to adverse employment action on the basis of her opposition to discrimination on the basis of gender, color and/or race.

66. Johnson reported to NCC's finance office that Defendant Smith and NCC only paid her for only 72 hours despite her having worked 87 hours and having taken one sick day because Smith had required her to take a leave without pay, on the basis of gender, color and/or race .

67. Defendant NCC's stated reasons are pretext for unlawful retaliation.

68. As a result of Defendant NCC's violations of Title VII, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to her career and damage to her professional and personal reputation.

## COUNT III
### The Americans with Disabilities Act of 1990
### 42 U.S.C. § 12101, *et seq.*
### Discrimination
### (Against Defendant NCC)

69.     Johnson incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

70.     At all times relevant to this complaint, Johnson was an "employee" as defined at and provided for under the ADA. 42 U.S.C. § 12111(4).

71.     At all times relevant to this complaint, Smith and NCC was an "employer" as defined at and provided for under the ADA. 42 U.S.C. § 12111(5)(A)

72.     Johnson suffers from chronic urticaria.

73.     Johnson has a disability, as the term is defined under the ADA, in that she has an impairment that substantially limited one or more major life activities.

74.     Defendant NCC unlawfully discriminated against Johnson and Johnson suffered an adverse employment action when NCC discriminated against Johnson because of her disability when they:

    a.  Suspended her teleworking although Johnson was suffering from serious health conditions;

    b.  Denied Johnson's April 2024 reasonable accommodation request; and

    c.  Terminated her employment on May 20, 2024.

75.     These adverse actions occurred under circumstances that raise a reasonable inference of unlawful discrimination due to Johnson's disability.

76.     Defendant NCC had no legitimate business reason for its adverse actions, and its stated reasons for the adverse actions are pretextual.

77.     Johnson has sustained damages as a result of Defendant NCC's illegal discrimination in violation of the ADA, including, but not limited to, damage to her career and damage to her professional and personal reputation.

78.     Johnson is entitled to such legal or equitable relief as will effectuate the purposes of the statute, including but not limited to economic, compensatory and punitive damages, injunction, and reasonable costs and attorneys' fees.

**COUNT IV**
**The Americans with Disabilities Act of 1990**
**42 U.S.C. § 12101, *et seq.***
**Retaliation**
**(Against Defendant NCC)**

79.     Johnson incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

80.     At all times relevant to this complaint, Johnson was an "employee" as defined at and provided for under the ADA. 42 U.S.C. § 12111(4).

81.     At all times relevant to this complaint, Smith and NCC was an "employer" as defined at and provided for under the ADA. 42 U.S.C. § 12111(5)(A).

82.     Johnson engaged in protected activity when she notified Smith and NCC of her disability to work remotely and then again when she requested a reasonable accommodation on or about April 17, 2024.

83.     Defendant NCC unlawfully discriminated against Johnson and Johnson suffered an adverse employment action when NCC discriminated against Johnson because of her disability when they:

   a.  Suspended her teleworking although Johnson was suffering from serious health conditions;

12

b.   Denied Johnson's April 2024 reasonable accommodation request; and

c.   Terminated her employment on May 20, 2024.

84.   The close temporal proximity between Johnson's protected conduct and her termination demonstrate causation.

85.   Defendant NCC had no legitimate business reason for their adverse actions. Defendants' stated reasons for the adverse actions are pretextual.

86.   Johnson has sustained damages as a result of Defendant NCC's illegal discrimination in violation of the ADA, including, but not limited to, damage to her career and damage to her professional and personal reputation.

87.   Johnson is entitled to such legal or equitable relief as will effectuate the purposes of the statute, including but not limited to economic, compensatory and punitive damages, injunction, and reasonable costs and attorneys' fees.

### COUNT V
### (*Adler* Claim)
### Wrongful Discharge/Public Policy
### (Against all Defendants, Jointly and Severally)

89.   Johnson incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

90.   Johnson was an at-will employee of NCC and Earl Smith.

91.   Johnson and NCC are subject to MD. CODE ANN., Lab. & Empl. § 5-104(a).

92.   Maryland law requires that a "[e]ach employer shall provide each employee of the employer with employment and a safe place of employment that are: (1) safe and healthful; and (2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee." *See* MD. CODE ANN., Lab. & Empl. § 5-104(a).

93.   Johnson notified Defendants that they were not providing each employee with a

13

safe place of employment that was safe, healthful, or free from recognized hazards causing or likely to cause death or serious physical harm to employees.

94. NCC's unsafe, unclean, and hazardous workplace put its employees at risk of death or serious physical harm.

95. Johnson raised concerns about the presence of vermin and other hazards in the workplace, and Defendants ignored Johnson's concerns. Johnson filed a federal OSHA complaint on or about April 26, 2024 reporting that the work environment was not safe and healthful and stating that she and other employees were facing respiratory difficulties due to the conditions.

96. Defendants terminated Johnson's employment on or about May 20, 2024, only 24 days after she filed her federal OSHA complaint.

97. For Defendants' unlawful discharge in violation of public policy against Johnson, she is entitled to such legal or equitable relief as allowable under Maryland common law, including, but not limited to, reasonable attorneys' fees, compensatory damages, punitive damages, damages for humiliation and embarrassment, front and back pay, interest on all damages, equitable relief, consequential damages, and any other relief that this Court deems just and equitable.

**COUNT VI**
**Montgomery County, Maryland Human Rights Ordinance**
**Md. Code Ann., State Gov't § 20-1202 *et seq*.**
**Discrimination Based on Gender**
**(Against all Defendants, Jointly and Severally)**

98. Johnson hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

99. Montgomery County Code § 27-19(a) provides that a person must not

discriminate against any person on the basis of gender.

100.    NCC is a "person" and an "employer" as defined by Section 27-19 of the Montgomery County, Maryland Code.

101.    Smith is a "person" and an "employer" as defined by Section 27-19 of the Montgomery County, Maryland Code.

102.    Johnson is an "individual" and an "employee" as defined by Section 27-19 of the Montgomery County, Maryland Code.

103.    Johnson is a member of a protected class under Montgomery County Code § 27-19(a) because she is female.

104.    Defendants unlawfully discriminated against Johnson with respect to her conditions and privileges of employment because of her gender when they terminated her employment on or about May 20, 2024.

105.    Defendants' actions raise a reasonable inference of discrimination in light of the surrounding circumstances.

106.    Defendants had no legitimate business reason for its adverse actions and all stated reasons for the adverse actions are pretextual.

107.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Johnson has been damaged in an amount to be determined at trial, including, but not limited to, the following: costs of litigation, attorney's fees, emotional distress, and all other forms of economic, compensatory and punitive damages.

108.    Johnson sustained substantial monetary and non-monetary damages as a direct and proximate result of Defendants' unlawful discrimination.

<u>**COUNT VII**</u>
**Montgomery County, Maryland Human Rights Ordinance**
**Md. Code Ann., State Gov't § 20-1202 *et seq.***
**Discrimination Based on Race**
**(Against all Defendants, Jointly and Severally)**

109.    Johnson hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

110.    Montgomery County Code § 27-19(a) provides that a person must not discriminate against any person on the basis of race.

111.    NCC is a "person" and an "employer" as defined by Section 27-19 of the Montgomery County, Maryland Code.

112.    Smith is a "person" and an "employer" as defined by Section 27-19 of the Montgomery County, Maryland Code.

113.    Johnson is an "individual" and an "employee" as defined by Section 27-19 of the Montgomery County, Maryland Code.

114.    Johnson is a member of a protected class under Montgomery County Code § 27-19(a) because she is African American.

115.    Defendants unlawfully discriminated against Johnson with respect to her conditions and privileges of employment because of her race when they terminated her employment on or about May 20, 2024.

116.    Defendants had no legitimate business reason for its adverse actions and all stated reasons for the adverse actions are pretextual.

117.    Defendants' actions raise a reasonable inference of discrimination in light of the surrounding circumstances.

118.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct, Johnson has been damaged in an amount to be determined at trial, including, but not limited to, the following: costs of litigation, attorney's fees, emotional distress, and all other forms of economic, compensatory and punitive damages.

119.    Johnson sustained substantial monetary and non-monetary damages as a direct and proximate result of Defendants' unlawful discrimination.

**<u>COUNT VII</u>**
**Montgomery County, Maryland Human Rights Ordinance**
**Md. Code Ann., State Gov't § 20-1202 *et seq*.**
**Discrimination Based on Disability**
**(Against all Defendants, Jointly and Severally)**

120.    Johnson hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

121.    Montgomery County Code § 27-19(a) provides that a person must not discriminate against any person on the basis of disability.

122.    NCC is a "person" and an "employer" as defined by Section 27-19 of the Montgomery County, Maryland Code.

123.    Smith is a "person" and an "employer as defined by Section 27-19 of the Montgomery County, Maryland Code.

124.    Johnson is an "individual" and an "employee" as defined by Section 27-19 of the Montgomery County, Maryland Code.

125.    Johnson is a member of a protected class under Montgomery County Code § 27-19(a) because she has a disability, chronic urticaria.

126.    Defendants unlawfully discriminated against Johnson with respect to her conditions and privileges of employment because of her disability when they terminated her employment on or about May 20, 2024.

127.    Defendants' actions raise a reasonable inference of discrimination in light of the surrounding circumstances.

128.    Defendants had no legitimate business reason for their adverse actions and all stated reasons for the adverse actions are pretextual.

129.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Johnson has been damaged in an amount to be determined at trial, including, but not limited to, the following: costs of litigation, attorney's fees, emotional distress, and all other forms of economic, compensatory and punitive damages.

130.    Johnson sustained substantial monetary and non-monetary damages as a direct and proximate result of Defendants' unlawful discrimination.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.    Judgment against the Defendants in the amount of economic damages, compensatory damages, liquidated damages, and punitive damages to be determined at trial;

B.    Pre-judgment interest;

C.    Employment, reinstatement, promotion, or other equitable relief;

D.    Economic damages including front and back pay;

E.    Compensatory damages;

F.    Interest due on unpaid wages;

G.    Reasonable attorneys' fee and the costs of this action, and;

H.    Any other relief this Honorable Court deems just and proper to award.

## DEMAND FOR JURY TRIAL

Johnson demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,


/s/ R. Scott Oswald_____
R. Scott Oswald, MD Bar 25391
Kellee Boulais Kruse, MD Bar 20362
The Employment Law Group, P.C.
1717 K Street, NW, Ste. 1110
Washington, D.C. 20006
(202) 261-2810
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
kkruse@employmentlawgroup.com
Counsel for Plaintiff